We're going to move now to case number four of the morning, number 19-2781, Blanton v. Roundpoint Mortgage Servicing Corporation et al. And we'll begin with Mr. Rubenstein. Thank you, Your Honor. May it please the Court. I represent the plaintiff and the appellant, Melcina Blanton, in this case. This is a case about callousness in the treatment of an essential worker with respect to her foreclosure and her accounts. What we have here is a simple – I'm going to recite the facts. I will explain why the summary judgment granted by the district court was improper, and then I will reserve my additional two minutes for rebuttal. First, the facts. What we have here is Melcina Blanton, an essential worker who works as a United States postal worker. She had a mortgage on her account for four years. After four years, the servicer who was handling her account switched to a company called Roundpoint, who is the defendant and appellee in this case. In 2013, when Roundpoint took over, they sent her a letter indicating that her account was in default and indicating that she was missing payments on her account, which was false. What had happened was that in the process of taking over, they had mistakenly not accounted for payments that had been sent to the prior servicer. In addition to that, what they did was they increased her payments by improperly adjusting her PMI payments by $137 a month. Now, to a person like Melcina Blanton, $137 a month is a 13% increase on her account and puts her mortgage in a situation where it's untenable. She normally pays approximately $1,000 a month, and this raised it to $1,150, which to a large bank like Roundpoint and a large firm like Lockwood seems like making a mountain out of a molehill, as they quote-unquote. But to her, that puts it at a position where she can no longer pay her mortgage. What's even more egregious is the fact that Roundpoint admits four months later that they made a mistake. After countless calls and letters and reaching out to them to correct this mistake, Roundpoint later admits that they overcharged her for three months on this account. Now, what happened is that when Melcina Blanton learned that she was being overcharged, in addition to calling and sending letters, she refused to pay that additional amount. She only paid the amount that she was normally supposed to pay on her mortgage. So when Roundpoint corrected this error and admitted their mistake three months later, there were late charges that remained on her account, which remain to this day. Here we are, seven years later. This took place in November 2013. Seven years later, there are late charges that remain on her account because she didn't pay these faulty charges back then. Then what happens is that because she didn't pay these faulty charges, and she refused to pay these faulty charges, Roundpoint initiated foreclosure proceedings on her account. Imagine you're sitting here as you're working for the post office, you're paying your mortgage every month. A new servicer takes over. They have no idea what they're doing. They double the charges for your account. You repeatedly send them letters and phone calls to change it, and they ignore it. And then they start foreclosure proceedings against you to kick you out of your home. It was at that point, finally, that she had enough. She filed her own lawsuit in state court against the actions by the servicer. And it was only at that point that they finally woke up, treated her like a person, and stopped the foreclosure proceedings. Because they realized their mistake. In addition to the issue of inflating her mortgage charges, they also did not reimburse her for taxes paid. And they also did not reimburse her for escrow accounts in her account, where she had approximately $3,900 in escrow. They did not apply it towards the mortgage that they claimed was now deficient or in default. They basically eliminated it. And it was only until two years later, in 2016, after we had filed this lawsuit, that they finally recredited her escrow account charges. Now, what are we doing here? The defendants are basically saying, no harm, no foul. Yes, we made a mistake. We overcharged you. We didn't apply these credits. But we corrected most of these things later on. But that doesn't change the fact of what happened. It doesn't change the fact that it deprived her of the money that she's entitled to. It doesn't change the fact that she was foreclosed on wrongfully. And it doesn't change the fact that there are still outstanding monies and actual damages owed to her today, as we sit here right now. Now, in the district court case, we raised eight separate facts, material facts that are in dispute. And I quoted specifically the language from each side, from depositions and letters, showing these disputes. They're reflected in our brief. They are as follows. Whether Roundpoint pays the plaintiff's taxes to the property, that's in dispute, because we allege, as we sit here today, that we have not been reimbursed for taxes. Two, whether Roundpoint refunded the property tax overpayment, that's also in dispute. Three, whether the plaintiff made a mortgage payment in full prior to filing a lawsuit foreclosure, that is in dispute. Four, whether the plaintiff accepted a trial modification offer from Roundpoint to resolve the dispute. And so what happened was that after these hijinks ensued, in order to try to resolve the situation, Roundpoint sent an unsolicited modification offer to my client, which she did not agree, she did not ask for it, and she did not accept it. Instead, what they did was they took her payments, that she was making her payments every month, applied it to a modification, and took that as a sign that she had entered the modification, and when she did not pay the late charges and extra fees, they again tried to foreclose on her a second time. Again, that is in dispute, because we never agreed to a modification, despite letters from Locklord saying that we did. And then there are six, whether Locklord regularly collects the debts of others. Seven, whether plaintiff suffered damages to her health as a result of the defendant's conduct. And eight, as of 2017, Roundpoint is still making miscalculations on her account. When they sent her a mortgage payment in 2018, increasing her mortgage from $1,031 a month to $1,647 a month. So there are at least eight different material facts in dispute. Only one disputed fact alone is sufficient to defeat the defendant's motion for summary judgment, let alone eight of them. Now, we have four separate counts for relief in this case. The first count is the FDCPA. The second count is the IFCA. Third count is conversion. And the fourth count relates to violations of RESPA. I will go through each count and explain why the lower court erred in their ruling. Mr. Rubenstein, just so you know, you've got about two minutes and 15 seconds remaining. Okay. With regard to the FDCPA, the principal issue is the law says that a debt collector has to regularly collect debts. And Locklord's own website states unequivocally that they collect debts on behalf of cases. They handle collection cases. So they admit on their own website that they collect collection. Now, they've disputed that, saying that they only handle commercial collections and not regular collections or consumer collections. But their website doesn't say that. At minimum, that's a material fact in dispute. Secondly, the FDCPA also says that if a servicer takes over a debt that's already in default at the time, then this debt collector definition doesn't apply the same way. And here, again, it's undisputed that when Roundpoint took over the loan and they sent a letter stating there was a deficiency, they determined that the account was deficient at the time they took over the loan. Now, that's a critical fact that the lower court didn't even address in their opinion. The second issue with the IFCA relates to damages and causation. Now, the lower court refused to allow us to argue damages and causation because they said that we're relying solely on the expert report of her treating physician. But that's not true. There are actual damages because it relates to the money that she lost here. As we alleged in the complaint, there were late charges that were unpaid and unaccounted for. There were taxes unpaid and unreimbursed. And there were escrow charges unreimbursed. But there were actual money damages in addition that were never addressed by the district court. Third, it relates to conversion. The fact that the district court said that conversion didn't take place because the defendants put the money back in in 2016. But that was two years after the fact, after we had to file a lawsuit. Well, conversion doesn't mean that it goes away just because they put the money back. Conversion means that they was unauthorized, took and withheld money for a period of time that they weren't supposed to. And for at least two years, they did not allow us to use that money. Mr. Rubenstein, thank you. That completes your time. Thank you. Thank you. We'll now hear from Mr. Standa on behalf of the appellee. Good morning. May it please the court. Good morning. The district court's well-reasoned decision was based on clearly established case law and the admissible evidence in the record. And that decision should be affirmed. From the outset of the case and what you just heard again this morning, Ms. Blanton has thought to create the image of the big bad bank and the large law firm ganging up to take advantage of an individual who could not fight back. But that just isn't the case. The record establishes that Ron Point corrected the error related to Ms. Blanton's private mortgage insurance within two months of the error occurring. Ms. Blanton then refused to send in payments for her taxes and insurance despite taxes and insurance having nothing to do with the private mortgage insurance calculation. Ron Point then offered to modify Ms. Blanton's mortgage loan to lower her payments and got sued for its efforts. Lock Lord was then retained to represent Ron Point in that lawsuit and tried to settle the case via loan modification. And then Lock Lord got sued for its efforts. What the record does not contain is anything indicating that any of Ms. Blanton's health ailments are related to any conduct from Ron Point or Lock Lord. This case was pending in the district court for over three years. During that time, Ms. Blanton was given ample opportunity to conduct fact discovery. Written discovery was exchanged, multiple depositions were taken, and nowhere in the discovery is there any evidence opining that Ms. Blanton's health ailments were caused or connected to any conduct by Ron Point or Lock Lord. Further, Ms. Blanton was given the opportunity to retain an expert to opine on the cause of her ailments and she elected not to do so. Thus, the record is completely devoid of any admissible evidence indicating that Ms. Blanton's ailments were caused by the alleged misconduct of Ron Point or Lock Lord. The only person that provided evidence regarding Ms. Blanton's health issues was her treating physician, Dr. Bice. And even with that testimony, however, Ms. Blanton could not present evidence to create an issue of fact as to her damages for two reasons. First, Dr. Bice testified that he had no idea Ms. Blanton was having a disagreement with Ron Point or Lock Lord. And at no point during his treatment of Ms. Blanton was she ever healthy. Meaning that she was suffering from health ailments long before there was a small miscalculation on her private mortgage insurance. Second, and more importantly, the trial court correctly analyzed the record and this court's decision in Myers v. Amtrak to correctly decide that Dr. Bice could not offer an opinion on the cause of Ms. Blanton's ailments because he did not make such a determination at the time of his treatment. Ms. Blanton's reliance on a language of Rule 26 commentary confuses Dr. Bice's ability to testify at all, which he certainly is capable of doing, and his ability to testify as to causation of damages, which he cannot do because he did not make a determination at the time of his treatment and he did not submit an expert report. Thus, the record is devoid of any evidence to establish that appellees with approximate cause of any injuries Ms. Blanton may have suffered. The record also clearly demonstrates why the trial court was correct in granting summary judgment in Locke Lord's favor on Blanton's Fair Debt Collection Practices Act. The unrebutted affidavit from Locke Lord shows that Locke Lord does not engage in consumer debt collection efforts. Further, the Locke Lord webpage that Ms. Blanton points to is the Locke Lord's commercial debt finance group. Ms. Blanton did not challenge the affidavit and she did not put forth any effort during discovery to inquire about Locke Lord's debt finance practice group. Further, Ms. Blanton did not reply to these points and made an appellant's response brief because she did not bother to file a reply in this appeal. The district court correctly concluded that Locke Lord does not engage in any consumer debt collection activity and does not meet the definition of debt collector under the Fair Debt Collection Practices Act. As for Blanton's claim under the Real Estate Settlement Procedures Act, her argument that she set forth sufficient allegations to have the district court allow her claim to survive a motion to dismiss under Rule 12b-6 has no bearing on the district court's decision to grant summary judgment in Round Point's favor under Rule 56. After discovery, the evidence unequivocally establishes that Round Point set up an exclusive address for the receipt of notices of error. In order to receive the applicable protections provided under federal law, you must submit notices of error, request for information, and appeals of loan modification denials in writing to the designated address. The evidence establishes that Blanton did not send her letter to that designated address. The trial court relied on well-reasoned opinions from the 2nd, 5th, 6th, 9th, 10th, and 11th circuits, as well as the fact that Ms. Blanton did not seriously dispute that Round Point was entitled to summary judgment, to conclude the failure to send the letter to the designated address doomed her Real Estate Settlement Procedures Act claim. Again, Ms. Blanton did not file or apply to address this issue in this appeal, thus the district court's ruling should be affirmed. Finally, as for the conversion claim, the unrebetted evidence establishes that the funds that were held in the suspense account were applied to Ms. Blanton's payments from July 2014 through February 2015. The money was not converted. It was used to satisfy some of Blanton's obligations on her loan. For all of these reasons, the decision of the district court should be affirmed in its entirety. If there are no further questions, that's all I have. Thank you, Mr. Standa. Thank you, Mr. Rubenstein. The case will be taken under advisement.